# EXHIBIT A

# OPERATING AGREEMENT OF
# INSPIRED PURSUITS, LLC

The undersigned is the Member-Managed Inspired Pursuits, a limited liability company (the "Company") formed under the laws of the State of Wisconsin. The undersigned hereby adopts the following Operating Agreement and does hereby certify and agree as follows:

**I. NAME**

SECTION 1. The name of the Company is Inspired Pursuits, LLC. The business of the Company may be conducted under such trade or fictitious names as the Managers may determine.

**II. OFFICES; REGISTERED AGENT**

SECTION 1. The principal office of the Company is located at 6300 Enterprise Ln., Madison, Wisconsin 53719. The Company may have other offices, inside or outside the state of Wisconsin, as the Managers may designate.

SECTION 2. The registered office of the Company in the state of Wisconsin is located at 6300 Enterprise Ln., Madison, Wisconsin 53719. The registered agent of the Company for service of process at that address is Suzanne Grundahl.

**III. PURPOSES AND POWERS**

SECTION 1. The Company may carry on any lawful business, purpose or activity for which a limited liability company may be organized under Chapter 183 of the Wisconsin Statutes (the "Act"). The Company possesses and may exercise all the powers and privileges granted by the Act or any other law or by this agreement, together with any powers incidental thereto including such powers and privileges as are necessary or convenient to the conduct, promotion or attainment of the businesses, purposes or activities.

**IV. MEMBERS**

SECTION 1. The name of the initial Members, their capital contributions, and percentage interest are as follows:

| Daniel N. Holland | $100,000 | 50% |
|---|---|---|
| Suzanne Grundahl | $50,000 | 25% |
| Kirk Grundahl | $50,000 | 25% |

SECTION 2. Additional Members may be admitted upon the consent of all Members.

**V. MEMBERS' CAPITAL ACCOUNTS**

SECTION 1. The Company will maintain a separate capital account for each Member. Each Member's capital account will reflect the Member's capital contributions and increases for the Member's share of any net income or gain of the Company. Each Member's capital account will also reflect decreases for distributions made to the Member and the Member's share of any losses and deductions of the Company. SECTION 2. Each Member's capital account will be increased by: 1) the amount of money or the fair market value of property contributed by the Member to the Company (net of any liabilities secured by such contributed property that the Company is considered to assume or take subject to), 2) the amount of any Company liabilities assumed by the Member, and 3) allocations to the Member of profit, income or gain.

SECTION 3. Each Member's capital account will be decreased by: 1) the amount of money and the fair market value of property distributed to the Member by the Company (net of any liabilities secured by such distributed property that the Member is considered to assume or take subject to), and 2) allocations to the Member of losses, deductions, and expenses.

SECTION 4. In the event of a permitted sale or exchange of an interest in the Company, the capital account of the transferor will become the capital account of the transferee.

SECTION 5. The manner in which capital accounts are to be maintained pursuant to this Operating Agreement is intended to comply with the requirements of the Internal Revenue Code and the regulations thereunder. It is the specific intent of the Members that all adjustments as may be required pursuant to the Internal Revenue Code and any regulations thereunder be made, so as to cause the allocations prescribed hereunder to be respected for tax purposes.

SECTION 6. The fiscal year of the Company will be a calendar year. The books and records of the Company will be maintained in accordance with generally accepted accounting principles and of the Internal Revenue Code and the regulations thereunder.

## VI. ALLOCATIONS AND DISTRIBUTIONS

SECTION 1. All items of Company income, gain, loss, deduction, credit, or the like will be allocated among the Members in accordance with their respective Percentage Interests.

SECTION 2. Distributions of cash or other assets may be made to the Members from time to time. All distributions will be made to the Members in accordance with their respective Percentage Interests.

## VII. ASSIGNMENT OF MEMBERSHIP INTERESTS

SECTION 1. A Member may assign his or her Membership Interest in the Company in whole or in part. A Membership interest consists of the Member's share of the profits and losses of the Company and the Member's right to receive distributions of Company assets. The assignment of a Membership Interest does not in and of itself entitle the assignee to become a Member. The assignee will only become an assignee of a Membership Interest and not a substitute Member.

SECTION 2. An assignee of a Membership Interest will be admitted as a substitute Member and will be entitled to all the rights and powers of the assignee only if the other Members unanimously consent. If admitted, the substitute Member has, to the extent assigned, all of the rights and powers, and is subject to all of the restrictions and liabilities of a Member.

## VIII. VOTING; MEETINGS OF MEMBERS

SECTION 1. Except to the extent provided to the contrary in this Operating Agreement, all Members will be entitled to vote on any matter submitted to a vote of the Members and will be entitled to one vote in the proportion that each Member's Percentage Interest bears to all Members' Percentage Interests person or by proxy for each share of interests having voting power held by the Member.

SECTION 2. All meetings of Members for the transaction of such business as may properly come before the meeting, will be held on such date and at such place and time as the Managers determine.

SECTION 3. Special meetings of Members for any proper purpose or purposes may be called at any time by the Managers or by the holders of at least fifty one (51) percent of the interest of all Members. Annual meeting of Members shall not be required to be held.

SECTION 4. The Company will deliver notice stating the date, time, place, and purposes of any meeting to each Member entitled to vote at the meeting.

SECTION 5. Except as otherwise provided by the Act or the Articles of Organization, the holders of fifty one (51) percent of the interests entitled to vote, present in person or by proxy, will constitute a quorum at all meetings of the Members for the transaction of business.

SECTION 6. Members may elect a Manager in the event a Manager no longer acts in that capacity or to fulfill a vacancy in the event the number of Managers is increased.

SECTION 7. Unless a greater vote is required by Act, the Articles of Organization, or this Operating Agreement, the affirmative vote of a majority of the interests having voting power present in person or by proxy will control the decision on any matter.

SECTION 8. A Member may participate and vote at any meeting via telephone conference call or other equipment that allows participants to hear each other.

SECTION 9. Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting if consents in writing, setting forth the action so taken, are signed by all the Members entitled to vote at the meeting.

SECTION 10. A Member may appoint a proxy to vote or otherwise act for the Member by signing an appointment instrument, either personally or by the Member's attorney-in-fact. Proxies may be appointed by telephonic or electronic transmission.

**IX.   MANAGEMENT OF THE COMPANY**

SECTION 1. The ordinary and usual decisions concerning the business affairs of the Company will be made by the Managers.

SECTION 2. The Company will be managed by three (3) Managers. The number of Managers may be increased or decreased by amendment to this Operating Agreement, but no decrease will have the effect of shortening the term of any Manager.

SECTION 3. The initial Managers will be Daniel Holland, Kirk Grundahl and Suzanne Grundahl.

SECTION 4. Each Manager may receive such compensation for serving as Manager as the Members may from time to time determine.

SECTION 5. Subject to the delegation of rights and powers provided for herein, the Managers will have the sole right to manage the business of the Company and will have all powers and rights necessary, appropriate or advisable to effectuate and carry out the purposes and business of the Company. No Member, by reason of his or her status as such, will have any authority to act for or bind the Company.

SECTION 6. The Managers may appoint a president, secretary, treasurer or such other officers as they may deem necessary or appropriate.

SECTION 7. The Managers may appoint, employ, or otherwise contract with other persons or entities for the transaction of business of the Company or the performance of services for or on behalf of the Company as they may deem necessary or appropriate. The Managers may delegate to any officer of the Company or to any other person or entity such authority to act on behalf of the Company as they may deem appropriate.

SECTION 8. Any Manager, officer, or other person specifically authorized by the Managers may execute any contract or other agreement or document on behalf of the Company and may execute and file on behalf of the Company with the secretary of state any document required or permitted to be filed under the Act

SECTION 9. Manager vacancies will be filled by a vote of a majority of the remaining Managers, or if there are

none, by a vote of a majority in interest of the Members.

SECTION 10. Managers will serve until they resign, die, become incapacitated or are removed. Managers may be removed by Members for any reason at any time.

SECTION 11. A Manager may resign at any time by giving notice to the Company.

## X.  MEETINGS OF MANAGERS

SECTION 1. Regular meetings of Managers may be held at such time and at such place as the Managers designate. Special meetings of Managers may be called at the request of any Manager.

SECTION 2. Unless a greater vote is required by the Act, the Articles of Organization, or this Operating Agreement, the affirmative vote or consent of a majority of the Managers present at a meeting at which a quorum is present will be the act of the Managers.

SECTION 3. A majority of the number of Managers will constitute a quorum for the transaction of business at a meeting of Managers.

SECTION 4. Any action required or permitted to be taken at a meeting of the Managers may be taken without a meeting, if consents in writing, setting forth the action taken, are signed by all Managers entitled to vote at the meeting.

SECTION 5. A Manager may participate in a meeting by means of face-to-face, telephone or online conference.

## XI.  STANDARD OF CONDUCT; INDEMNIFICATION

SECTION 1. A Manager of the Company will perform his or her duties as a Manager in good faith and in a manner he or she reasonably believes to be in the best interests of the Company and with such care as an ordinarily prudent person in a like position would use under similar circumstances.

SECTION 2. The Company will indemnify any Manager and may indemnify any employee or agent of the Company who was or is a party or is threatened to be made a party to any action, suit or proceeding, other than an action by or in the right of the Company, by reason of the fact that such person is or was a Manager, employee or agent of the Company against expenses, including attorney's fees, judgments, penalties, fines, and amounts paid in settlement actually and reasonably incurred by such person in connection with the action, suit or proceeding, if the person met the standard of conduct set forth above in this Article.

To the extent that a Manager, employee, or agent of the Company has been successful on the merits or otherwise in defense of an action, suit, or proceeding, such person will be indemnified against actual and reasonable expenses, including attorney's fees, incurred by such person in connection with the action, suit, or proceeding and any action, suit or proceeding brought to enforce the mandatory indemnification provided herein. Any indemnification permitted under this Article, unless ordered by a court, will be made by the Company only as authorized in the specific case upon a determination that the indemnification is proper under the circumstances because the person to be indemnified has met the applicable standard of conduct. That determination will be made by a majority vote of the Managers who are not parties or threatened to be made parties to the action, suit, or proceeding.

No indemnification will be provided to any Manager, employee, or agent of the Company for or in connection with the receipt of a financial benefit to which such person is not entitled, voting for or assenting to a distribution to Members in violation of this Operating Agreement or the Act, or a knowing violation of law.

## XII. DURATION; DISSOLUTION

SECTION 1. The Company will continue in existence until dissolved pursuant to this Article or the Act.

SECTION 2. The Company will be dissolved and have its affairs wound up and terminated upon the determination of all the Members to dissolve the company, or upon the occurrence of any other event causing a dissolution of the Company.

SECTION 3. Upon dissolution, the Company will cease carrying on its business and affairs and will commence the winding up of the Company's business and affairs and complete the winding up as soon as practicable. Upon the winding up of the Company, the assets of the Company will be distributed first to creditors to the extent permitted by law in satisfaction of the Company's debts, liabilities, and obligations, and second to Members and former Members in satisfaction of liabilities for distributions and in accordance with their percentage interests.

## XIII. MISCELLANEOUS PROVISIONS

SECTION 1. This Operating Agreement embodies the entire agreement and understanding among the Members with respect to the subject matter within. This Operating Agreement supersedes any and all other agreements, either oral or written, among the Members with respect to the subject matter within.

SECTION 2. Every provision of this Operating Agreement is intended to be severable. The invalidity or illegality of any particular provision of this Operating Agreement will be construed in all respects as if such invalid or illegal provisions were omitted.

SECTION 3. This Operating Agreement may be amended or revoked at any time by the written consent of all of the Members.

SECTION 4. This Operating Agreement will be governed by, construed, and enforced in accordance with the laws of the State of Wisconsin.

IN WITNESS WHEREOF, the undersigned has duly execute this Operating Agreement effective as of December 22, 2022.

_____
Daniel N. Holland

_____
Kirk Grundahl

_____
Suzanne Grundahl

# EXHIBIT B

 **Mutual Non-Disclosure Agreement**

QF 37 | REVISED 9/8/2022 | REVISION 7

THIS AGREEMENT, dated __8/8/23__, (the "Agreement") is made effective by and between __John Holland__ and Qualtim, a Wisconsin corporation, DrJ Engineering, a Wisconsin Limited Liability Company, Center for Building Innovation, a Wisconsin Limited Liability Company and Pushing7, a DBA of Qualtim, Inc. (the parties hereto are sometimes referred to individually as a "Party" and together as the "Parties"), and applies to certain Confidential Information (as hereinafter defined) that has been or may be disclosed by a Party ("Disclosing Party") to the other party ("Receiving Party").

WHEREAS, the Parties intend to disclose to each other certain confidential information for the specific purpose of enabling the Parties to evaluate, propose and enter into a possible business relationship; and

WHEREAS, as a result of the above, negotiations between the Parties may result in the formation of a contractual relationship;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the Parties agree as follows:

1.1 DEFINITIONS. "Confidential Information" means, without limitation, all tangible or intangible information respecting, or materials (in any medium) comprising, describing, embodying or incorporating: (A) technical, business or financial information and know-how, cost, performance or process data, methods of doing business, marketing or business operational plans, strategies, forecasts or forecast assumptions, trading volumes, trading patterns or practices, technology, computer software and hardware products, data bases, data processing or communications networking systems, practices or procedures or other systems or controls (existing, planned or in any stage of development) used, owned, developed or in development (or planned to be developed) by or on behalf of the Disclosing Party, samples, equipment, drawings, specifications, customer and prospective customer information, current and future product information, facilities tours, supplier information, contracts, prices, manufacturing information, reports, documents, photographs, machines, tools, prototypes, models, inventions, patent disclosures, materials, requests for proposal or quotation, characteristics and identities, trade secrets and other ideas, concepts, know-how, methodologies and information incorporated therein, items marked "confidential," and other items which, by their nature, are generally considered proprietary and confidential (regardless of whether such information is specifically labelled as such); (B) the content of the Parties' current communications, discussions, evaluations or negotiations in connection with a potential contractual relationship; or (C) any information or materials of the Disclosing Party related to any proposed transaction resulting from discussions between the Parties. "Confidential Information" includes both information owned by the Disclosing Party and information owned by third parties or that the Disclosing Party is obligated to treat as confidential. Confidential Information also includes all information or materials derived from or based on Confidential Information and all complete or partial copies or reproductions (in any form or medium) of Confidential Information. All information described herein and information about the Disclosing Party obtained from a third party shall be considered confidential information except as follows:

Confidential Information shall not include information which (i) is or becomes part of the public domain without breach of this Agreement by the Receiving Party, (ii) was acquired by the Receiving Party prior to receipt from the Disclosing Party and is not otherwise subject to an obligation of confidentiality, or (iii) is developed independently by the Receiving Party, without reference, directly or indirectly, to Confidential Information of the Disclosing Party, or (iv) is hereafter made available to the Receiving Party for use or disclosure by the Receiving Party from any third party having a right to do so. In the event of a disputed disclosure, the Receiving Party shall bear the burden of proof of demonstrating that the information falls under one of the within-described exceptions.

1.2 INDEPENDENT DEVELOPMENT. Disclosing Party understands that Receiving Party may currently or in the future be developing information internally, or receiving information from other parties, that may be similar to Disclosing Party's information. Accordingly, nothing in this Agreement shall be construed as a representation or inference that Receiving Party independently will not develop, or have developed on Receiving Party's behalf,

    THE QUALTIM FAMILY OF BRANDS
*Where building innovation thrives.*

 QF 37: Mutual Non-Disclosure Agreement

products or systems, for itself or for others, that compete with the products or systems contemplated by Disclosing Party's information.

1.3 LIMITED USE. The Receiving Party shall use Confidential Information of the Disclosing Party only for the limited purpose of evaluating and/or entering into a business relationship and/or for the purpose of fulfilling the contractual relationship between the Parties, and for no other purpose, unless otherwise agreed in writing by the Disclosing Party or by the Parties mutually.

1.4 OWNERSHIP. All Confidential Information disclosed by the Disclosing Party to the Receiving Party shall remain, as between the Parties, the exclusive property of the Disclosing Party. The Receiving Party shall not be deemed to have any intellectual property right or other right, license, title or interest in Confidential Information of the Disclosing Party by reason of disclosure hereunder by the Disclosing Party, except the limited rights to use the Confidential Information stated in Section 1.3 of this Agreement.

1.5 DUTY OF NON-DISCLOSURE. Unless the Disclosing Party consents in writing, the Receiving Party shall not disclose any of the Disclosing Party's Confidential Information to any person or entity other than: (i) to those individuals among its employees, partners, officers, officers and directors of its partners, and its consultants (including, but not limited to, financial advisors, accountants and attorneys) (collectively, "Representatives") who have a need to receive such Confidential Information for the limited purposes described herein; and (ii) as required under any applicable law, regulation or final order or request of any court, administrative, regulatory or self-regulatory body or any other governmental agency, in which case, the Receiving Party shall where legally permitted: (a) promptly notify the Disclosing Party thereof; (b) consult with the Disclosing Party on the advisability of taking steps to restrict or narrow such request; and (c) if disclosure is required or deemed advisable, cooperate with the Disclosing Party in any attempt that it may make to obtain an order or other reliable assurance that confidential treatment will be accorded to designated portions of the Confidential Information.

1.6 SECURITY PRECAUTIONS. Before disclosure to any Representative, the Receiving Party will advise the Representative of the obligations and restrictions imposed herein. The Receiving Party shall instruct its Representatives to hold in confidence all such Confidential Information. After disclosure by the Receiving Party to certain of its Representatives, the Receiving Party shall be responsible for compliance by such Representatives with the confidentiality obligations set forth herein. In addition to the foregoing, the Receiving Party shall take such other reasonable steps to protect the Disclosing Party's Confidential Information, applying at least the same security measures and level of care as it employs to protect its own confidential information and trade secrets of like nature, but not less than a reasonable standard of care.

1.7 RESTRICTIONS ON COPYING. The Receiving Party shall not make any copies of any Confidential Information of the Disclosing Party, except those which are reasonably necessary to carry out the limited purposes stated in Section 1.3 of this Agreement.

1.8 RETURN OF CONFIDENTIAL INFORMATION. The Receiving Party shall, to the extent permitted by law, promptly return to the Disclosing Party or destroy all tangible copies of all Confidential Information of the Disclosing Party, including without limitation, all documents, all drawings, all sketches, all designs and other record-bearing media comprising, containing, derived from or based on, Confidential Information of the Disclosing Party, together with all copies thereof, upon the earliest of: (i) request by the Disclosing Party, or (ii) upon receipt of notice of breach from the Disclosing Party. The Disclosing Party may choose, at its option, to leave the original or a copy of any Confidential Information in the possession of the Receiving Party for the mutual convenience of the parties. Notwithstanding the above, legal counsel for the Receiving Party may retain one copy of such in its files for archival purposes only.

1.9 COOPERATION. The Receiving Party agrees that, either upon learning of, or upon a showing by the Disclosing Party of any threatened or actual breach of the provisions of this Agreement by (i) the Receiving Party or (ii) the Receiving Party's Representatives, the Receiving Party shall promptly notify the Disclosing Party thereof and shall cooperate as reasonably requested by the Disclosing Party, at the Disclosing Party's cost and expense, in connection with the Disclosing Party's efforts to seek appropriate injunctive relief or otherwise to prevent or curtail such threatened or actual breach or unauthorized use or disclosure of or to recover its Confidential Information.

 QF 37: Mutual Non-Disclosure Agreement

1.10 NONSOLICITATION. Each Party agrees, during the duration of this Agreement, and for a period of one (1) year following the date of termination of this Agreement, that the Party shall not, either on its own account or for any person, firm, partnership, corporation, or other entity (a) solicit, interfere with, or endeavor to cause any employee of the other Party to leave his or her employment, or (b) induce or attempt to induce any such employee to breach her or his employment agreement with the other Party.

1.11 NOTICES. Notices must be in writing and sent either by hand delivery; messenger; by facsimile; certified mail, return receipt requested; overnight courier; or by e-mail (with a confirming copy by one of the other methods providing notice) and shall be effective when received by such party.

| | |
|---|---|
| If to: | |
| Address: | |
| City, State, ZIP: | |
| Attn: | |
| Telephone: | |
| Email: | |

| | |
|---|---|
| If to: | Qualtim, Inc. |
| Address: | 6300 Enterprise Lane |
| City, State, ZIP: | Madison, WI 53719 |
| Attn: | Suzanne Grundahl |
| Telephone: | 608-310-6710 |
| Email: | sgrundahl@qualtim.com |

1.12 TERMINATION; SURVIVAL OF OBLIGATIONS. This Agreement will terminate one (1) year from the end of evaluating and/or entering into a business relationship and/or for the purpose of fulfilling the contractual relationship between the Parties, or either Party may terminate this Agreement by providing one month's written notice to the other Party. The confidential obligations set forth in this Agreement shall survive for a period of five (5) years from the date of termination of this Agreement, except that trade secrets shall remain confidential for so long as the Disclosing Party treats such information as trade secrets.

1.13 SUCCESSORS AND ASSIGNS. No Party may assign or transfer this Agreement in whole or in part without the prior written consent of the other Party. Any purported assignment in violation of the foregoing shall be null and void. Notwithstanding the above, either party may assign this Agreement, without the consent of the other party, to an entity that acquires all or substantially all of its assets or business related to this Agreement.

1.14 GOVERNING LAW. This Agreement shall be governed by the laws of the State of Wisconsin without regard to its conflict of law provisions.

1.15 SEVERABILITY. If any provision of this Agreement should be held invalid or unenforceable in a court of law in any jurisdiction, such invalidity or unenforceability shall not affect the enforceability of this Agreement or any other provision hereof. In addition, the Parties agree that it is their intention that such provision shall be construed in a manner designed to effectuate the purposes of this Agreement to the fullest extent enforceable under applicable law. The Parties further agree that such ruling shall not affect the construction of that provision or any other of the provisions in any other jurisdiction.

1.16 FINAL AGREEMENT. This Agreement is the final and entire agreement between the Parties with regard to the subject matter hereof, and all previous discussions, promises and representations relative hereto are hereby superseded.

 QF 37: Mutual Non-Disclosure Agreement

1.17 WAIVER; MODIFICATION. No waiver by any Party of any term or condition hereof shall be valid unless made in writing signed by an authorized representative of that Party. No waiver on one occasion shall be effective to waive that or any other term or condition on any other occasion. No exercise of any remedy by any Party on one occasion shall be deemed an exclusive election of that remedy on that or any other occasion. All modifications to this Agreement shall be in writing and signed by authorized representatives of the Parties. No oral agreement, statement or representation shall be effective.

1.18 BREACH; REMEDIES. In the event of a threatened or actual breach of this Agreement by the Receiving Party, the Disclosing Party shall be entitled to: (1) seek immediate injunctive relief in a court of competent jurisdiction in accordance with Section 20 below (subject to notice and opportunity to defend in accordance with applicable law) and (2) demand the immediate return of all Confidential Information of the Disclosing Party from the Receiving Party subject to the same limitations set forth in Section 9. The foregoing shall be in addition to and without prejudice to such other rights as the Disclosing Party may have, subject to the express provisions of this Agreement (or any other applicable agreement), at law or in equity.

1.19 INJUNCTIVE RELIEF. The Receiving Party acknowledges and agrees that, in the event of a material unauthorized use or disclosure by the Receiving Party of, or the failure to return upon request, the Disclosing Party's Confidential Information in breach of the provisions of this Agreement, the Disclosing Party may suffer irreparable injury not compensable by money damages and for which the Disclosing Party will not have an adequate remedy available at law. Accordingly, if the Disclosing Party institutes an action or proceeding to enforce the provisions of this Agreement, the Disclosing Party shall be entitled to seek to obtain such injunctive or other equitable relief from a court of competent jurisdiction without the posting of bond, as may be necessary or appropriate to prevent or curtail any such breach, threatened or actual.

1.20 DISCLAIMER OF PARTNERSHIP/AGENCY; NO THIRD PARTY BENEFICIARIES. Each Party agrees that it is not an agent, joint venturer or partner of the other Party. This Agreement shall not be construed to constitute or to create a partnership or a joint venture or any other form of legal association that would impose liability upon one Party for the act or failure to act of the other Party or as providing any Party with the right, power or authority (express or implied) to create any duty or obligation on behalf of the other Party. Except as expressly provided to the contrary in this Agreement, no third party is intended to be, and no third party shall be deemed to be, a beneficiary of any provision of this Agreement.

1.21 NO WARRANTY. The Disclosing Party provides Confidential Information without representations, warranties, assurances or guarantees of any kind, including, but not limited to, with respect to the Disclosing Party's patents, copyrights, trademarks, trade secrets or other proprietary rights nor shall provision of such Confidential Information constitute an inducement by the Disclosing Party with respect to the infringement of patents, copyrights or other rights of others. The Disclosing Party will not be liable for any damages arising out of the Receiving Party's use of Confidential Information disclosed under, and in accordance with, this Agreement.

1.22 NO BUSINESS RELATIONSHIP. Nothing contained in this Agreement shall be construed as requiring either party to enter into a business relationship or any contractual relationship except as to the confidentiality obligations set forth therein.

1.23 EXECUTION OF AGREEMENT. This Agreement may be executed in counterparts. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

 QF 37: Mutual Non-Disclosure Agreement

IN WITNESS WHEREOF, each Party has caused this Agreement to be duly signed and delivered as of the date first set forth above.

Sincerely,

*Suzanne M Grundahl* (signature)
Suzanne Grundahl
Vice President
sgrundahl@qualtim.com
608-310-6710

_____
Company

_____
Signature

John Holl_ (print)
Print Name

President
Title

8/8/2023
Date